# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 98-KA-00251-SCT

*SCOTT MORGAN a/k/a*
*GLENN SCOTT MORGAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/23/1998 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CYNTHIA HEWES SPEETJENS |
| | THOMAS E. ROYALS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  BILLY L. GORE |
| DISTRICT ATTORNEY: | E. LINDSAY CARTER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 8/19/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: 09/09/99 | |

**BEFORE PRATHER, C.J., WALLER AND COBB, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. Five men were named in a Forrest County conspiracy indictment. Appellant Scott Morgan, a Hattiesburg policeman, and two lawyers were charged with conspiring to defraud the conservatorship of Jack Diamond, a Picayune businessman who had become incapacitated as a result of a series of strokes. The indictment also named

Charles Morgan (Appellant's father) and former Chancellor William Robert Taylor, both deceased, as unindicted co-conspirators. After a severance and a change of venue to Harrison County, a jury trial was held before Special Circuit Judge William F. Coleman. Morgan was convicted of conspiracy and was sentenced to five years in the custody of the Mississippi Department of Corrections with two years suspended, three years to serve, and five years of supervised probation. Morgan raises seven issues on appeal:

**I. The indictment was insufficient to inform Morgan of the crime with which he was charged.**

**II. The trial court erred in granting Jury Instruction 13.**

**III. It was error to allow the prosecution to cross-examine Morgan on allegations that he had been accused of police brutality.**

**IV. The trial court erred in refusing to grant a continuance.**

**V. The trial court erred in failing to grant a JNOV because the evidence was not sufficient to support a conviction for conspiracy.**

**VI. The trial court erred in admitting out-of-court statements made by alleged co-conspirators.**

**VII. The trial court erred in allowing the jury to hear evidence of Judge Taylor's suicide.**

## STATEMENT OF FACTS

¶2. Jack Diamond owned and operated Allied Heirlooms, a profitable business in Picayune, Mississippi. Allied Heirlooms' primary business was cleaning and preserving wedding dresses. Diamond suffered a series of strokes in 1993 and 1994 which left him unable to care for himself or attend to his estate. A conservatorship for Diamond was established in 1994.

¶3. A series of conservators, guardians ad litem, attorneys, and other individuals engaged by the conservatorship came and went before Scott Morgan ("Morgan") became involved in the conservatorship. In December of 1995, Chancellor Taylor appointed his long-time friend Charles Morgan, Scott Morgan's father, as Successor Conservator for Jack Diamond. Charles Morgan initially was paid on an hourly basis for his services as conservator. Eventually he charged a flat fee of $7,500 per month. Shortly after Charles Morgan became Diamond's conservator, Morgan was named head of security for the conservatorship. He was paid $2,000 for an initial security

survey, and later he was paid $3,000 per month as chief of security for the conservatorship. The conservatorship paid these sums, and the payments were approved by Chancellor Taylor.

¶4. Charles Morgan died on August 13, 1996. Judge Taylor and Greg Alston, the attorney for the conservatorship, approached Morgan at his father's funeral and told him that he was to be the new conservator. Morgan was appointed conservator on August 15, 1996. Morgan began receiving $7,500 per month as compensation for his duties as conservator. Morgan continued to work full-time as a Hattiesburg police officer where he made approximately $31,000 a year. Morgan and Alston agreed to pay the entire $7,500 monthly payment for August, 1996, to Joanne Morgan, Morgan's mother, even though Charles Morgan had only served through August 13, the date of his death. Alston and Morgan also agreed that Morgan would receive $7,500 for August even though he didn't begin to serve until August 15. These payments were approved by Judge Taylor.

¶5. During his tenure as chief of security for the conservatorship, Morgan hired friends and relatives, including several fellow Hattiesburg police officers, as security officers for Diamond and Allied Heirlooms in Picayune. He paid them $25 an hour even though the prevailing rate for similar work was $5.35 to $12 an hour. Morgan paid $6,647.60 to Jennifer Morgan, his wife, for security work performed from February to July of 1996. He paid $15,802.40 to Mike Dewease, his brother-in-law, over the time period from February to October, 1996. After Morgan replaced his father as conservator, he hired his brother, Chuck Morgan, to be the new chief of security. Chuck Morgan received $3,000 per month as security chief even though he worked offshore as a helicopter pilot, had no law enforcement experience, and had only two security officers to supervise. All in all, the Morgans spent over $65,000 in conservatorship funds on security. Testimony at trial revealed that there were conflicting opinions on the need for any security at all.

¶6. The prosecution showed that many conservatorship checks were written before the expenditures had been approved by the Chancellor and that Charles Morgan often withheld large amounts of cash from the conservator's paychecks he deposited into his personal account. The State attempted to infer that the cash withheld by Charles Morgan was paid to Judge Taylor, who had once paid for a Rolex watch with $10,900 in cash taken out of a paper bag.

¶7. Jay Jernigan served as attorney for the conservatorship in 1994 and 1995. On several occasions during that period of time Judge Taylor asked Jernigan to pad his legal bills and return part of the excess to him. On four or five occasions, Judge Taylor told Jernigan that he needed $3,000. Jernigan concluded that this was an attempted solicitation of a kickback by the judge. There was no proof that the judge

ever actually received any payment.

¶8. Gene Combs testified that he approached Judge Taylor about purchasing Allied Heirlooms. The judge told Combs that if he allowed Combs to purchase the business, one-third of the business would have to be reserved for the judge personally. The judge also requested a political contribution. Combs also testified that Alston had told him that the judge would retain a third of the purchase price if the business was sold.

¶9. Scott Morgan testified in his own defense. He stated that he had not entered any conspiracy to defraud the conservatorship, that he had never paid kickbacks to the judge, and that the expenditures he had made as conservator were reasonable.

## LAW

### I. Was the indictment sufficient to inform Morgan of the charge against him?

¶10. Morgan claims that the indictment against him was so vague and indefinite that it did not fairly inform him of the crime alleged against him. The indictment read:

> Beginning from on or about August 9, 1993 and continuing through November, 1996, in Forrest County, Mississippi, Gregory Alston, Scott Morgan, and Ike Farris, the defendants herein, did willfully, knowingly, unlawfully and feloniously conspire and agree together and with the late Chancery Judge William Robert Taylor, the late Charles Morgan, and with persons known and unknown to the Grand Jury, to cheat and defraud the conservatorship of Jack Diamond out of property and money in excess of $250.00, by means which are in themselves criminal, or which, if executed, would amount to a cheat, or to obtain money or any other property or thing by false pretense, in violation of MCA 97-1-1(d), as amended.
>
> *****
>
> The scheme consisted of obtaining payment, payment for fees and services which were not reasonable, necessary, or earned, including, but not limited to attorneys fees, conservator fees, and fees for the Guardian ad litem. The scheme further included payments to Scott Morgan, his friends, family and relatives for services, including but not limited to security services, which were not reasonable, necessary or earned. The scheme also included demands by Judge Taylor for payment of money to him for which he was not entitled nor authorized by law to receive.

That all of the above conduct is in violation of MCA 97-1-1(d), as amended, MCA 97-1-1(f) and is against the peace and dignity of the State of Mississippi.

¶11. The accused "has a constitutional right to be informed of the nature and material elements of the accusation filed against him." *Burchfield v. State*, 277 So. 2d 623, 625 (Miss. 1973). In order to be sufficient, "the indictment must contain the essential elements of the crime with which the accused is charged." *Hennington v. State*, 702 So. 2d 403, 407 (Miss. 1997). Rule 7.06 of the Mississippi Uniform Rules of Circuit and County Court Practice requires that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation." *King v. State*, 580 So. 2d 1182, 1185 (Miss. 1991). Nothing more is required. Additionally, "an indictment which tracks the statutory language is generally sufficient to inform the accused of the charge against him." *Cantrell v. State*, 507 So. 2d 325, 329 (Miss. 1987).

¶12. The indictment in this case fairly placed Morgan on notice that he was charged with conspiring with others to defraud the conservatorship of Jack Diamond. The indictment included the period of time involved, named four of the known alleged co-conspirators, and described the fraud as obtaining unreasonable or unearned payments or fees from the conservatorship and charging the conservatorship for unnecessary security. It tracked the language of Miss. Code Ann. § 97-1-1 (1994). The indictment sufficiently notified Morgan of the charge against him and enabled him to prepare a defense. This issue is without merit.


## II. Did the trial court err in granting Jury Instruction 13?

¶13. Morgan claims that granting Jury Instruction 13 was error because it arguably failed to require jurors to find that Morgan was a member of the conspiracy and also failed to require the jurors to be unanimous as to the identity of the person or persons with whom Morgan conspired. Morgan also argues that the instruction failed to conform to the indictment in that the indictment alleged that Morgan conspired with Taylor, Alston, Farris, Charles Morgan, and other unknown persons, while the instruction allowed the jury to find that Morgan conspired with any one of the alleged co-conspirators by using the word "or." Jury Instruction 13 read as follows:

> A conspiracy is an agreement or understanding between two or more people to commit a crime. The crime of conspiracy is complete when the agreement is made. Therefore, the crime of conspiracy is separate and distinct from the crime contemplated by the conspiracy. Whether or not the conspirators accomplished

the crime they conspired to commit is immaterial to the question of guilt or innocence.

In establishing a conspiracy, the State is not required to prove an expressed or formal agreement between the conspirators to commit a crime. It is sufficient for the State to prove, beyond a reasonable doubt, from all of the facts and circumstances of this case, together with the acts of the parties, that Judge William Robert Taylor, and/or Charles Morgan, and/or Gregory Alston, and/or Scott Morgan, and/or Ike Farris knowingly and voluntarily entered into a common plan with the understood purpose to commit a crime. Express language or specific words are not required to prove involvement in a conspiracy

If a conspiracy has been shown to exist beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, then any reasonably foreseeable act of a conspirator in furtherance of the conspiracy is considered by law to be the act of any other member of the conspiracy. Each conspirator is responsible for the reasonably foreseeable acts of any other member of the conspiracy done in furtherance of the conspiracy. Furthermore, one may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. A person may be held as a conspirator regardless of the point in time in which he enters it, so long as he enters it with the intent to further its objects during the life of the conspiracy.

¶14. Morgan argues that the wording of the instruction allowed a conviction of Morgan if the jury believed that any other two of the alleged co-conspirators agreed to commit a crime. Alternatively, he claims that the instruction did not require unanimity in the jurors' verdict in that some could have believed that Morgan conspired with one other actor and other jurors could have believed that he conspired with someone else, but the verdict would be the same even though the jury potentially could be agreeing on a different conspiracy. Morgan also claims that the variance between the indictment and Instruction 13 is reversible error.

¶15. Defense counsel objected to Instruction 13 on the grounds that it was misleading and that it did not require jurors to find that Morgan was actually a part of the conspiracy in order to convict. Morgan did not object to the question of the unanimity of the jury's verdict or to the variance between the instruction and the indictment. In order to preserve a jury instruction issue on appeal, a party must make a specific objection to the proposed instruction in order to allow the lower court to consider the issue. *Watson v. State*, 483 So. 2d 1326, 1329 (Miss. 1986). Further, "[a]n objection on one or more specific grounds constitutes a waiver of all other grounds." *Stringer v. State*, 279 So. 2d 156, 158 (Miss. 1973). *See also* *McGarrh v. State*, 249 Miss.

247, 276, 148 So. 2d 494, 506 (1963) (objection cannot be enlarged in reviewing court to embrace omission not complained of at trial). Whether the instruction required a unanimous verdict and whether Instruction 13 fatally varied from the indictment are procedurally barred and will not be considered here.

¶16. We do consider whether Instruction 13 was confusing in that it arguably allowed the jury to find that Taylor and Alston conspired together and that Morgan was guilty without any finding that he joined in the conspiracy. Individual jury instructions are not to be reviewed in isolation. The instructions are read as a whole in order to determine if the jury was properly instructed. *Willie v. State*, 585 So. 2d 660, 680 (Miss. 1991). This Court must consider the other instructions given this jury. Jury Instruction 10 read as follows:

> You are instructed that to establish a conspiracy, the State is not required to prove that two or more persons entered into a solemn compact, orally or in writing, stating that they have formed a conspiracy to violate the law, setting forth the details of the plan, the means by which the unlawful plan is to be carried out, or the specific part to be played by each conspirator. It is sufficient to show the existence of a conspiracy if the State proves beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence from the evidence in this case **that two or more persons, one of which was the defendant, Scott Morgan,** in any manner or through any contrivance, express or inferred, voluntarily came to a common understanding to violate the law as set forth herein and express language or specific words are not required to prove involvement in a conspiracy.

> Thus, if you believe from the evidence in this case, beyond a reasonable doubt and to the exclusion of every other hypothesis consistent with innocence, that on August 9, 1993, through November 1996, an agreement, express or implied, existed between Scott Morgan and one or more persons to commit a crime, namely to cheat and defraud Jack Diamond out of property in excess of $250.00 by any means which are in themselves criminal, or which, if executed, would amount to a cheat, or to obtain money or any other property or thing by false pretense, then it is your sworn duty to find the defendant, Scott Morgan, guilty as charged.

(Emphasis added.) Additionally, Instruction 4 required the jury to find ". . . that Scott Morgan is guilty of having taken part in a criminal conspiracy to defraud the Jack Diamond conservatorship." Finally, Instruction 11 stated that in order to return a guilty verdict, the jury must be convinced beyond a reasonable doubt that "Scott Morgan knew the unlawful purpose of the agreement and joined in it wilfully, that is, with the

intent to further the purpose of the conspiracy."

¶17. Considered in totality, the instructions properly instructed the jury as to the law in this case. While Instruction 13 by itself arguably was misleading, when considered in conjunction with the rest of the instructions, there is no question that the jury was properly instructed. Morgan's contention that Instruction 13 was misleading in that the jury could have been misled that Morgan could be found guilty if two other parties conspired to defraud Diamond is without merit.

### III. Did the trial court err in allowing cross examination of Morgan on allegations that he had been accused of police brutality?

¶18. Morgan argues that reversal is required because the trial judge allowed the State to question him about allegations of police brutality. Morgan took the stand in his defense and testified on direct examination as follows:

> Q. Did you win any awards or commendations while you were a police officer with the Hattiesburg Police Department?
>
> A. Yes, sir. I was awarded officer of the year two separate times, and I was awarded a medal of honor by the Police Department for service.
>
> **Q. Did you ever have your character or integrity questioned while you were a police officer?**
>
> **A. No, sir.**

(Emphasis added.)

¶19. Former Hattiesburg police officer Sherman Howell also testified for the defense. On direct examination he was asked the following question:

> Q. And at any time during your entire tenure in law enforcement, up to this very minute, have you ever know (sic) of any situation in which Scott Morgan's integrity with respect to that cash or anything else in his law enforcement career when his integrity was ever questioned in any way?
>
> A. No, ma'am.

¶20. On cross examination, the State elicited the following testimony from Morgan:

Q. Scott, you testified that you were officer of the year twice and received a medal of valor and all of this in your capacity as a police officer; is that right?

A. That's right.

Q. You had some serious problems as a police officer, too, didn't you?

A. How is that?

Q. Brutality suits?

A. Yes, sir, I did.

Q. How many?

A. I am not sure. I was cleared - -

¶21. In response to the defense's objection, the trial judge responded, "I think you opened it up." The trial judge allowed only the limited questioning about the existence of complaints lodged against Morgan. He refused to allow the State to delve into the details of those allegations.

¶22. Rule 404 of the Mississippi Rules of Evidence restricts the use of character evidence. Under the Rule, a defendant is allowed to introduce evidence of his own good character. After the defendant's character is placed in issue, Rule 404(a)(1) allows the prosecution to impeach the defendant's credibility by rebutting his assertions of good character. *Quinn v. State*, 479 So. 2d 706, 708 (Miss. 1985). When the accused raises the issue of his character, the prosecution may then offer evidence of the accused's bad character. *Rowe v. State*, 562 So. 2d 121, 123 (Miss. 1990). Further, "[a] defendant's character is put in issue when he states that he has a good character or a good record, or when he otherwise offers evidence of good character." *Id.* (*citing* **1 Wharton's Criminal Evidence** § 169 (1985)).

¶23. This Court has held that "[w]here an accused, on direct examination, seeks to exculpate himself, such testimony is subject to normal impeachment via cross-examination, and this is so even though it would bring out that the accused may have committed another crime." *Stewart v. State*, 596 So. 2d 851, 853 (Miss. 1992). By testifying that he was a decorated police officer and by stating that his character and integrity had never been questioned, Morgan placed his performance as a police officer in question. It would be unfair to allow Morgan to testify to his unquestioned character and not allow the State to impeach Morgan's assertions. *Lester v. State*, 692 So. 2d 755, 780 (Miss. 1997), *overruled on other grounds*, *Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999). *Quinn v. State*, 479 So. 2d at 708-09. This issue is without merit.

## IV. Did the trial court err in refusing to grant a continuance?

¶24. Prior to trial, Morgan requested a continuance of the criminal proceedings until the Chancery Court could rule on the final conservatorship accounting he had filed shortly before the criminal trial began. Morgan sought a determination in the Chancery Court that the fees and expenses he received from conservatorship funds were not excessive. He now claims that refusing to grant that continuance prejudiced his defense and is reversible error.

¶25. In order to preserve this issue for appeal, Morgan was required to include the denial of the continuance in his motion for new trial. *Pool v. State,* 483 So. 2d 331, 336 (Miss. 1986). Morgan's motion for new trial and for judgment notwithstanding the verdict made no mention of the denial of a continuance. Because the issue was not properly preserved, and because the trial court did not have the opportunity to rule on this claimed error, this issue is not properly before this Court and is procedurally barred.

¶26. Notwithstanding the procedural prohibition, this claim fails on the merits. Trial judges have wide latitude in deciding whether to grant continuances, and that decision is left to the sound discretion of the trial judge. *Lambert v. State,* 654 So. 2d 17, 22 (Miss. 1995). Denial of a continuance is not reversible unless manifest injustice appears to have resulted from the denial. *Hatcher v. Fleeman,* 617 So. 2d 634, 639 (Miss. 1993). The trial judge's refusal to grant a continuance was not an abuse of discretion, nor is there any indication of manifest injustice resulting from the denial of a continuance. This issue is without merit.

## V. Should the trial court have granted a JNOV because the weight and sufficiency of the evidence did not support a conviction?

¶27. In order to prove a conspiracy under Miss. Code Ann. § 97-1-1, the State was required to show that two or more persons agreed to commit a crime or agreed to accomplish an unlawful purpose. *Johnson v. State,* 642 So. 2d 924, 928 (Miss. 1994). The State had the burden of showing beyond a reasonable doubt that Scott Morgan agreed with at least one of the other alleged co-conspirators to defraud the conservatorship of Jack Diamond. This Court has stated that "it is difficult to define fraud. In its commission there are devices 'almost infinite in variety.' As it involves breach of duty, trust, or confidence, it includes all acts, omissions, or concealments by which another is injured, or an undue or unconscientious advantage is taken." *Cumbest v. State,* 456 So. 2d 209, 217 (Miss. 1984) (*quoting Smith v. State,* 107 Miss. 486, 496, 65 So. 564, 567 (1914)).

¶28. The State was required to prove that Morgan knew that he was entering a common plan and intended to further its common purpose. *Mitchell v. State*, 572 So. 2d 865, 867 (Miss. 1990). The prosecution was not required to show that the parties entered an express or formal agreement. A conspiracy can be proven by the acts and conduct of the alleged conspirators and can be inferred from the circumstances. *Johnson v. State*, 642 So. 2d at 928; *Mitchell v. State*, 572 So. 2d at 867; *Rose v. State*, 556 So. 2d 728, 735 (Miss. 1990). Finally, once the existence of a conspiracy is shown, only slight evidence is required to connect a particular defendant with the conspiracy. *United States v. James*, 528 F.2d 999, 1012 (5th Cir.1976).

¶29. The standard for reviewing the denial of a motion for JNOV is well-settled:

> [W]e must, with respect to each element of the offense, consider all of the evidence-not just the evidence which supports the case for the prosecution- in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Franklin v. State*, 676 So. 2d 287, 288 (Miss. 1996) (*quoting* *Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987).

¶30. The evidence in this case established that Morgan and others received what certainly appeared to be an excessive and unreasonable amount of money from the conservatorship of Jack Diamond. The double payment of $7,500 for the month of August is particularly indefensible. The proof showed that Morgan's decisions with regard to expenditures for security were not warranted. The jury clearly could have found that paying family and friends $25 per hour for questionable security was not justified. Morgan's decision to pay his brother, who worked off-shore, $3,000 per month to supervise two part-time security officers is equally suspect. From the facts established at trial and reasonable inferences therefrom, a reasonable jury could have found that there had been a breach of trust or confidence in which Morgan injured or took advantage of the conservatorship of Jack Diamond. Thus, there was sufficient proof that a fraud was committed by Scott Morgan.

¶31. The State is also entitled to reasonable inferences with regard to the existence of a conspiratorial agreement between Morgan and another person. This fraud was accomplished through otherwise normal conservatorship proceedings. An attorney

drafted and submitted petitions and orders for Morgan's unjustifiable expenditures. A chancellor placed his stamp of approval and the appearance of legality on these conservatorship expenditures by signing the orders. Given the close personal relationship between Chancellor Taylor and Charles Morgan, the circumstances under which Morgan became the conservator, and the fact that Chancellor Taylor and Alston obviously were involved with approving the payments, a reasonable inference can be made that Morgan entered an agreement with Taylor and Alston to benefit themselves at the expense of the Diamond conservatorship. The evidence at trial was sufficient to prove beyond a reasonable doubt that Morgan was guilty of conspiring to defraud the conservatorship. This issue is without merit.

### VI. Did the trial court err in allowing into evidence out-of-court statements of alleged co-conspirators?

¶32. Morgan complains that the admission into evidence of out-of-court statements by Judge Taylor and Greg Alston were irrelevant and highly prejudicial to the defense and that their admission was reversible error. Alston was indicted as a co-conspirator. Taylor was named in the indictment as a co-conspirator but was not indicted.

¶33. The prosecution was allowed to elicit testimony from Jay Jernigan, the former attorney for the conservatorship, that on four or five occasions in 1995, Judge Taylor had requested that Jernigan pad his legal bills and pay part of the excess fee to the judge. On several occasions, Judge Taylor told Jernigan that he needed $3,000 and implied that Jernigan should overcharge the conservatorship to pay the kickback. Prosecution witness Gene Combs was allowed to testify that when he approached Judge Taylor about purchasing Allied Heirlooms, the judge told him that one-third of the business would have to be set aside for himself (the judge). Combs also testified that Greg Alston told him that a third of the sale price of the business would have to be retained for Judge Taylor.

¶34. Morgan objected to the admission of the out-of-court statements. The trial judge's basis for allowing the statements is unclear from the record.

¶35. A statement soliciting a bribe is not hearsay. *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993); *United States v. Villarreal*, 764 F.2d 1048, 1050 n.2 (5th Cir. 1985). Judge Taylor's bribe solicitation was not offered to prove the truth of the matter asserted. The testimony was offered to prove that a solicitation was made, not that Judge Taylor actually needed $3,000. The "verbal act" of the solicitation is not hearsay. Even though they are not hearsay, the solicitation attempts still must be relevant to be admissible. Even if relevant, Mississippi Rule of Evidence 403 prohibits the introduction of evidence if the probative value of the testimony is substantially

outweighed by its prejudicial effect. Miss. R. Evid. 403.

¶36. Judge Taylor's statements to Jernigan in which he attempted to solicit a bribe occurred in 1994 and 1995. None of the other four men named in the indictment had become involved in the conservatorship at that point. Morgan did not become involved until he was named head of security in January of 1996. However, the State put on no proof that a conspiracy to defraud the conservatorship existed in 1994, and the State failed to show any connection between the solicitation attempt at that point and Morgan's later involvement. The only proof for that period of time was that Judge Taylor was soliciting kickbacks. Because there was no showing of a conspiracy in 1994 when Judge Taylor's statements soliciting a kickback were made, and because there was no showing of any connection between Morgan and the bribery attempt, those statements were irrelevant and should not have been introduced.

¶37. Morgan also objected to the admission of Combs' testimony as to the statements of Judge Taylor and Alston about the judge's intentions to retain one-third of the sale price of the business was admissible under Rule 801(d)(2)(E) as statements of co-conspirators. The record is not clear about when those statements were made. However, it is clear that those statements were not made in the course and in furtherance of the conspiracy between Morgan and others to defraud the conservatorship. There is no relation between Judge Taylor's proposal to a potential purchaser and the conspiracy between Morgan and others to defraud the Diamond conservatorship by grossly charging excessive fees as discussed above. There was no proof that Morgan had any part in Judge Taylor's proposed deal to sell the business, and there is no indication that he could have profited in any way from it. The statements with regard to Judge Taylor's intentions to keep a portion of the purchase price of the business for himself were not admissible as co-conspirator's statements against Morgan because it was not shown that the statements were in the course and in furtherance of the conspiracy between Morgan and others.

¶38. The State also claims that these statements are admissible under Mississippi Rule of Evidence 804(b). Rule 804(b) provides in part:

> (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> *****
>
> (3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true . . . .

[Miss. Rule of Evid. 804(b)](#).

¶39. Rule 804(b)(3) is only available when the declarant is unavailable. Judge Taylor, who was long since dead, was clearly unavailable. A statement made by him may be admissible if the statement "clearly and directly implicates the declarant himself in criminal conduct." *Williams v. State*, 667 So. 2d 15, 19 (Miss. 1996) (*quoting United States v. Sarmiento-Perez*, 633 F.2d 1092, 1101 (5th Cir. 1981)); *see also Ponthieux v. State*, 532 So. 2d at 1246. The statements by Judge Taylor declaring his intention to retain one-third of the purchase price of the business might meet the requirements for admission under Rule 804(b)(3). However, since there has been no credible evidence offered of any link between attempts by Judge Taylor to solicit a kickback from potential buyers and the Morgan conspiracy to defraud the conservatorship by charging unearned fees and collecting unreasonable amounts for unnecessary security, those statements are not relevant to the Scott Morgan case.

¶40. There is no indication that Alston was not available as a witness. The fact that he was indicted and might exercise his right against self-incrimination does not make him unavailable. *Slater v. State*, 731 So. 2d 1115 (Miss. 1999). Because Alston was available as a witness, the hearsay exception does not apply, and the statements attributed to him were not admissible under Rule 804.

¶41. The testimony as to statements made by Judge Taylor and Alston was not admissible. The evidence was highly prejudicial to Morgan and deprived him of a fair trial. The admission of those statements is reversible error.

### VII. Did the trial court err in allowing evidence of Judge Taylor's suicide?

¶42. Morgan made pretrial and continuing contemporaneous objections to evidence that Judge Taylor had committed suicide. Morgan objected to the introduction of Taylor's death certificate which listed the cause of death as suicide. Morgan argues that evidence of the suicide was not relevant to the question of the existence of a conspiracy, and even if relevant, the prejudicial effect of that evidence substantially outweighed its probative value.

¶43. The State argued at trial and on appeal that the introduction of evidence of Judge Taylor's suicide, including his death certificate, was not erroneous because the indictment recited that Judge Taylor was deceased and the State was entitled, if not required, to prove what was alleged in the indictment. This explanation would seem more ingenuous if the State had also sought to introduce evidence, including a death certificate, that Charles Morgan was dead as was also stated in the indictment. It can be presumed that the State did not present evidence of Charles Morgan's death because his death certificate did not state that he had died of an intentional drug

overdose. Clearly, the reason the State wanted to put this information before the jury was to show Judge Taylor's guilty conscience and to have the jury transfer some Judge Taylor's apparent guilt to other parties, including Scott Morgan.

¶44. This Court has held that evidence "to the effect that the codefendant, or a person who is alleged to be a joint actor, committed suicide . . ., is prejudicial to the defendant and should not be shown in the evidence . . . ." *Craft v. State,* 254 Miss. 413, 421, 181 So. 2d 140, 143 (1965). Mississippi Rule of Evidence 403 provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice" to the defendant. The probative value of evidence that Judge Taylor died by suicide is negligible at best. Its probative value was clearly outweighed by the prejudicial effect of the jury hearing that one of the co-conspirators had killed himself. Introduction of evidence of Judge Taylor's suicide is reversible error.

## CONCLUSION

¶45. Because prejudicial hearsay testimony and evidence of Judge Taylor's suicide were erroneously allowed into evidence, the judgment of the trial court is reversed, and this case is remanded to the Forrest County Circuit Court for a new trial.

**¶46. REVERSED AND REMANDED.**

**PRATHER, C.J., BANKS, SMITH, MILLS AND COBB, JJ., CONCUR. SULLIVAN AND PITTMAN, P.JJ., AND McRAE, J., NOT PARTICIPATING.**